Andrew **PICKHOLTZ**, Plaintiff–
Appellant,

v.

**RAINBOW TECHNOLOGIES, INC.**
**and Software Security, Inc.,**
**Defendants–Appellees.**

No. 01–1173.

United States Court of Appeals,
Federal Circuit.

April 3, 2002.

Rehearing Denied April 29, 2002.

Vincent M. DeLuca, Rothwell, Figg, Ernst & Manbeck, P.C., of Washington, DC, argued for plaintiff-appellant. With him on the brief were Brent O. Hatch, Hatch, James & Dodge, P.C., of Salt Lake City, UT; and Mark F. James. Of counsel on the brief was Andrew Pickholtz, of San Francisco, CA.

Thomas L. Blasdell, Foley & Lardner, of Los Angeles, CA, argued for defendants-appellees. With him on the brief was John R. Hamilton, Foley & Lardner, of Orlando, FL.

James C. Turner, HALT—An Organization of Americans for Legal Reform, of Washington, DC, for amicus curiae HALT. Of counsel on the brief were Thomas M. Gordon and Steven E. Serdikoff.

Before MAYER, Chief Judge, LOURIE and DYK, Circuit Judges.

LOURIE, Circuit Judge.

Andrew Pickholtz appeals from the decisions of the United States District Court for the Northern District of California denying his motion for summary judgment of infringement and granting the defendants' ("Rainbow's") motion for summary judgment of noninfringement of Pickholtz's U.S. Patent 4,593,353. Pickholtz also appeals from the denial of his motion for attorney fees resulting from Rainbow's discovery misconduct. Because the court erred in construing the claims of the '353 patent, we reverse the court's grant of summary judgment in favor of Rainbow. Because there exist genuine issues of material facts under the proper claim construction, we affirm the court's denial of

Pickholtz's motion for summary judgment. Because the court abused its discretion in refusing to award attorney fees to Pickholtz, we vacate that decision. We remand for further consideration of the infringement issue under the proper claim construction and the attorney fee issue under the court's inherent power.

### BACKGROUND

A. *The '353 Patent and its Prosecution History*

Pickholtz is the inventor and owner of the '353 patent, which is directed to an apparatus for the prevention of piracy of computer software. The invention prevents computer software on an external memory device (*e.g.*, a magnetic disc) from executing on a computer unless the software is authorized to do so. '353 patent, abstract. The authorization check involves two authorization codes recorded on the external memory device along with the protected software. *Id.* The authorization codes are members of the same pseudorandom sequence, and the computer is equipped with a pseudorandom number ("PRN") generator that generates that sequence. *Id.* at col. 3, ll. 37–54. Before the invention enables execution of the software from the external media device, the first authorization code is read from the external media device and used to initialize the PRN generator. *Id.* From that initial condition, the PRN generator operates, thereby creating another PRN. *Id.* Only if that PRN matches the second authorization code on the external media device is the software allowed to execute. *Id.*

The '353 patent illustrates the invention in Figure 1, which the patent describes as "a block diagram representation of a computer *system* including software protection, in accordance with the present invention." *Id.* at col. 2, ll. 57–59 (emphasis added).

FIG. I

As the patent describes that figure, a "computer *system* 10" comprises a central processing unit ("CPU") 12 in communication with a main memory 14. *Id.* at col. 2, l. 66—col. 3, l. 1 (emphasis added). For additional details regarding possible embodiments of the CPU 12 and the main memory 14, the patent references two general microprocessor textbooks. *Id.* at col. 3, ll. 4–17. The computer system 10 also comprises a disc 18, on which is stored the protected software and the two authorization codes, as well as a PRN generator 22, which is preferably a hardware module encased in plastic, epoxy, or radiation opaque material to prevent inspection and tampering. *Id.* at col. 3, ll. 37–54, col. 5, ll. 21–32. Alternatively, the PRN generator 22 may be implemented in software. *Id.* at col. 5, ll. 21–32.

Pickholtz originally submitted claims to the Patent and Trademark Office ("PTO") defining the invention as a method and an apparatus for use with a "data processing system." However, Pickholtz changed his claims substantially before they were allowed. The examiner assigned to Pickholtz's patent application rejected all claims under 35 U.S.C. § 103 as being unpatentable over U.S. Patent 4,446,519, issued to David C. Thomas. Briefly, Thomas disclosed software that, when loaded into a computer's working memory, would generate a PRN to be sent to an electronic security device (ESD) on a plug-in circuit board for verification before enabling execution of the software. '519 patent at col. 1, l. 61—col. 2, l. 16. In response to the rejection, Pickholtz replaced the pending claims with new claims, which were allowed essentially as submitted, and argued that Thomas lacked (1) a PRN generator device "located in the computer"; (2) a sealed casing on the PRN generator device; and (3) a second authorization code stored on an external memory. The examiner then allowed the claims, and the PTO issued the '353 patent. Claim 1, the only independent claim in the '353 patent, defines the invention as an apparatus for use with a "computer" and specifies that the PRN generator device is "located in the computer":

1. A software protection apparatus using first and second authorization codes and a pseudorandom number, said software protection apparatus for use with a *computer*, comprising:

an external memory device having computer software and a first authorization code and a second authorization code at selected data locations, wherein said second authorization code is part of a pseudorandom sequence;

means for reading said external memory device, said reading means located in the computer;

pseudorandom number generator device *located in the computer* and coupled to said reading means, for generating a pseudorandom number in response to said reading means reading said first authorization code from said external memory device, said first authorization code being read prior to execution of said computer software, said pseudorandom number generator device including a sealed casing, thereby preventing identification of the pseudorandom number generator algorthim [sic];

processing means located in the computer and coupled to said reading means and said pseudorandom number generator device, for comparing the pseudorandom number generated by said pseudorandom number generator device with the second authorization code read from selected data locations in said external memory device, said processing means generating an enable signal in response to a positive comparison of the pseudorandom number with the second authorization code for enabling execution of the computer software stored in said external memory device.

'353 patent at col. 6, ll. 2–34 (emphasis added).

## B. *The District Court Proceedings*

Pickholtz, who is an attorney, brought suit *pro se* against Rainbow alleging that Rainbow infringed the '353 patent by its manufacture and sales of certain computer dongles, which are small devices that externally connect to a computer port. Rainbow's dongle, under the control of a driver program, acts as a hardware key, hindering any unauthorized use of computer software. The driver program detects the presence of the dongle and exchanges encrypted information with it, preventing execution of a protected software program unless the dongle is attached to a port of

the computer. Pickholtz alleged that the Rainbow dongle contains a PRN generator device as recited in claim 1, such that a computer with a Rainbow dongle attached and with its driver program executing infringes claim 1. Rainbow disputed the allegation that its dongle contains a PRN generator and argued that, even accepting that allegation, the dongle's PRN generator would not be "located in the computer," as the claim requires. Thus, a critical issue before the district court was construction of the term "computer" and the phrase "located in the computer" in claim 1.

Pickholtz proposed a broad construction of the term "computer," *viz.*, "one or more processing units and the memory, peripherals and other devices connected electronically to and communicating with the processing units." *Pickholtz v. Rainbow Techs., Inc.*, No. C 98–2661, slip op. at 5 (N.D.Cal. Apr. 28, 2000) (claim construction memorandum and order). Pickholtz supported that construction with technical literature and expert testimony. Rainbow proposed a narrower definition: a CPU and main memory, sans peripherals. *Id.* The district court adopted Rainbow's construction as the unambiguous meaning of the term on the basis of the patent's intrinsic evidence. *Id.* at 5–6 (construing the term "computer" as "the CPU and main memory on the CPU's circuit board, which taken together, form a part of a dedicated microprocessor system capable of executing instructions on data, and which exclude connected peripheral devices"). In arriving at that construction, the district court focused on two aspects of the intrinsic evidence. First, when describing Figure 1, the patent uses the term "computer system" to describe that collection of a CPU, main memory, a PRN generator, and a disc peripheral, whereas the claim uses the term "computer." From that distinction, the court concluded

that a "computer" is different from a "computer system." *Id.* at 5. Secondly, the phrase "located in the computer" would be surplusage if the term "computer" were construed as broadly as Pickholtz proposed. *Id.* at 5–6. The court also read Pickholtz's prosecution remarks traversing the Thomas rejection as drawing a distinction between a "computer" and peripherals connected to a computer. *Id.* at 6–7. Because Rainbow's construction flowed unambiguously from the intrinsic evidence, the court gave no weight to Pickholtz's extrinsic evidence. *Id.* at 6. As a consequence of its construction of the term "computer," the court construed the phrase "located in the computer" to mean "in the CPU, main memory or on the circuit board, but excluding connected peripherals," *id.* at 10, and consequently determined on summary judgment that Rainbow's dongles, being peripherals, do not infringe the '353 patent. *Pickholtz v. Rainbow Techs., Inc.*, 125 F.Supp.2d 1156, 1159–60 (N.D.Cal.2000).

During the course of the district court litigation, the parties had disagreements over discovery. Pursuant to local rules, Pickholtz was entitled to an electronic form of the source code utilized with Rainbow's dongles and supporting documentation. *Pickholtz v. Rainbow Techs., Inc.*, No. C 98–2661, slip op. at 1 (N.D.Cal. Apr. 24, 2000) (recommended order imposing sanctions). However, Rainbow did not promptly produce those documents. *Id.* On the ground of that tardiness, Pickholtz moved for sanctions under Fed.R.Civ.P. 37 as well as the court's inherent power. A magistrate found that "[n]o substantial justification exists for the approximate year that it took defendants to produce the source code and supporting documentation in electronic format." *Id.* However, "aware of no authority that would permit [him] to award plaintiff, a *pro se* litigant,

attorney's fees," the magistrate limited Pickholtz's monetary recovery to out-of-pocket expenses only. *Id.* at 2–3. The district judge adopted the magistrate's resolution of the discovery issue. *Pickholtz v. Rainbow Techs., Inc.,* No. C 98–2661, slip op. at 1 (N.D. Cal. June 9, 2000) (order).

Pickholtz appeals from the judgment of the district court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

 We review a district court's denial of summary judgment for an abuse of discretion. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1306, 54 USPQ2d 1910, 1912 (Fed.Cir. 2000). We review a district court's grant of summary judgment *de novo,* reapplying the same standard used by the district court. *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1275 (Fed. Cir.1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *McKay v. United States,* 199 F.3d 1376, 1380 (Fed.Cir.1999).

 A determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted.... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed. Cir.1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71, 34 USPQ2d 1321, 1322 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo, Cybor,* 138 F.3d at 1456, 46 USPQ2d at 1172 (Fed.Cir.1998). Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353, 48 USPQ2d 1674, 1676 (Fed.Cir.1998).

 The awarding of attorney fees under Rule 37 involves a procedural issue not unique to patent law, *DH Tech., Inc. v. Synergystex Int'l, Inc.,* 154 F.3d 1333, 1343, 47 USPQ2d 1865, 1873 (Fed.Cir. 1998); we therefore apply regional circuit law to that issue. *Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359, 50 USPQ2d 1672, 1675 (Fed.Cir. 1999) (en banc in relevant part). Because the Ninth Circuit reviews a refusal to impose sanctions under Rule 37 for an abuse of discretion, *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1297 (9th Cir.2000), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2592, 150 L.Ed.2d 751, 69 U.S.L.W. 3807 (2001), we will do the same. Accordingly, we will not disturb the district court's decision under Rule 37 "unless we have a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (quoting *Payne v. Exxon*

*Corp.,* 121 F.3d 503, 507 (9th Cir.1997) (applying the same standard in reviewing a district court's imposition of sanctions, rather than a refusal to impose sanctions, under Rule 37)). To the extent that the district court's decision not to impose sanctions rested on a legal interpretation of Rule 37, we review that interpretation *de novo. See Foster v. Tourtellotte,* 704 F.2d 1109, 1110–11 (9th Cir.1983) (reviewing *de novo* a district court's interpretation of the Equal Access to Justice Act as part of a decision not to award attorney fees pursuant to that act, where that decision was otherwise reviewed for an abuse of discretion).

Pickholtz argues that the district court's grant of summary judgment of noninfringement and denial of his own motion for summary judgment of infringement was based on a misconstruction of the term "computer" in the patent claims. Additionally, Pickholtz argues that the district court misinterpreted the law when it determined that it lacked authority to award a *pro se* litigant attorney fees under .Rule 37.

## A. *Claim Construction*

■ Pickholtz argues that the district court erred when it construed the term "computer" to exclude peripherals. He urges that whether a "computer" includes peripherals is unanswered by the intrinsic evidence and that we should therefore turn to the extrinsic evidence that supports his broader construction. He argues that "computer system" and "computer," as used in his patent, are synonymous. He further argues that the court's construction is wrong because a computer without peripherals would be incapable of accepting input or yielding output and therefore would be useless.

Pickholtz also contends that the court misconstrued the phrase "located in the computer" to mean "in the CPU, main memory or on the CPU circuit board, but excluding connected peripherals." First, he argues that the court's construction is inconsistent with the claims' requirement that the PRN generator device be in a sealed casing, with the specification's teaching that the PRN generator device is installable by the user on-site, and with the depiction in Figure 1 of the PRN generator device 22 as being separate from the CPU 12 and the main memory 14. Secondly, he argues that the court's construction of the phrase "located in the computer" is inconsistent with the court's construction of the term "computer" because the latter does not include the CPU circuit board. Thirdly, he urges that he did not distinguish his invention over Thomas during prosecution on the basis of the location of the PRN generator device.

Rainbow responds that the court's construction is the unambiguous result of the intrinsic evidence. Rainbow draws attention to the fact that the patent claims refer to a "computer," whereas the specification describes a "computer system" with reference to Figure 1. Thus, according to Rainbow, a "computer" is something less than a "computer system." Rainbow also defends the court's construction of the phrase "located in the computer" by arguing that it is consistent in part with the court's definition of the term "computer," that Pickholtz's broader construction would render the phrase superfluous, and that the prosecution history compels the court's construction.

■ In interpreting claims, a court "should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1577 (Fed.Cir. 1996). Only if a disputed claim term re-

mains ambiguous after analysis of the intrinsic evidence should the court rely on extrinsic evidence. *Id.* at 1583, 39 USPQ2d at 1577.

We agree with Rainbow that the proper construction of the term "computer" follows without ambiguity from the intrinsic evidence; however, that construction is not as Rainbow contends. Instead, we agree with Pickholtz that the '353 patent uses the terms "computer" and "computer system" as synonyms. Although we would typically be inclined to give meaning to the word "system," rather than regard it as surplusage, *see Elekta Instrument,* 214 F.3d at 1307, 54 USPQ2d at 1913, the patent in this case provides no indication that the two terms mean different things. Instead, the patent uses the term "computer system" in the specification and the term "computer" in the claims; nothing in the patent itself explicates their relationship or indicates any difference in meaning.

The remaining intrinsic evidence, the prosecution history, does not compel a different result. Pickholtz originally submitted the claims in vastly different form, referring to the invention as part of a "data processing system" and reciting "a pseudorandom number generator at the data processing system." Pickholtz changed the claims into their allowed form after the PTO rejected the claims as being obvious in light of the Thomas patent. Although Thomas clearly uses the terms "computer" and "computer system" in a part-whole relationship, '519 patent at fig. 2, col. 5, ll. 18–25, Pickholtz did not distinguish his invention over Thomas on the basis of any difference between a "computer" and a "computer system." Despite Pickholtz's argument to the PTO that Thomas lacks a "[PRN] generator device located in the computer," Thomas clearly discloses PRN generating software, and

that software is located in the core "computer" part of Thomas's "computer system." '353 patent at col. 4, ll. 37–48 (disclosing that the PRN generator is software loaded into the working memory and executed by the CPU). Pickholtz's argument, although inaptly stated, can only be understood to mean that he considered Thomas's software to not contain a PRN generator at all. Thus, although Pickholtz may have been casual and gratuitous in amending his claims and making arguments to distinguish over the Thomas patent, nothing in the prosecution history convinces us that the terms "computer" and "computer system" in the '353 patent have different meanings, even if they might have in the Thomas patent.

Accordingly, the district court erred when it concluded that the intrinsic evidence unambiguously imparted different meanings to the terms "computer" and "computer system." On the contrary, they are used interchangeably in the '353 patent. Because the meaning of the term "computer" can be resolved from the intrinsic evidence alone, we need not rely on any extrinsic evidence, *see Vitronics,* 90 F.3d at 1582, 39 USPQ2d at 1577, which in any event is not conclusive. While Pickholtz advanced a number of technical dictionaries defining "computer" as inclusive of peripherals, as well as expert testimony to the same effect, Rainbow disputed the meaning of those technical dictionaries and offered contrary expert testimony.

Furthermore, as the patent's specification includes one peripheral, a disc "reading means," as part of the "computer system," '353 patent at col. 6, ll. 11–12; fig. 1 (disc 18), the synonymous term "computer" in the claims must include at least some peripherals. However, the term "computer" cannot be so unbounded as to include all devices connected in any way to the CPU, or else the phrase "located in the

computer," and particularly the word "in," would become meaningless. A peripheral distantly connected reasonably cannot be "in the computer." Therefore, not everything somehow connected to a CPU can be a peripheral in the sense of being part of the "computer." At the very least, however, the term "computer" encompasses peripherals that are within a reasonable proximity to the CPU and its main memory and directly connected to the CPU or the CPU circuit board. We need not, and indeed cannot, attempt to precisely define which peripherals may be part of the "computer" as used in the '353 patent for all cases. *See EMI Group N. Am. v. Intel Corp.*, 157 F.3d 887, 895, 48 USPQ2d 1181, 1187 (Fed.Cir.1998) ("[I]t is irrelevant whether the district court achieved a technologically perfect definition, because there is no dispute that the corresponding step of the Intel process is within the literal scope of [the claim limitation]. Thus we do not attempt to decide, *de novo*, the correct meaning of [the claim limitation]."). The accused device in this case is certainly such a peripheral, as it indisputedly connects substantially directly to the CPU circuit board and is in close proximity to the CPU.

In summary, we construe the phrase "located in the computer" to mean "located in the CPU, main memory, the CPU or main memory circuit boards, or qualifying peripherals" as indicated above. In view of that construction, it necessarily follows that the Rainbow dongle, when attached to a computer port, is such a peripheral and is therefore "located in the computer." No reasonable juror could conclude otherwise.

## B. *Infringement*

 Because the district court granted summary judgment to Rainbow on the basis of an improper claim construction, we reverse that judgment. However, the court did not abuse its discretion in denying Pickholtz's motion for summary judgment of infringement. Besides arguing that its dongle is not "located in the computer" (an argument that fails under the correct claim construction), Rainbow argued below that its accused product fails to satisfy several other claim limitations, *e.g.*, whether the accused device reads an authorization code "prior to execution of the program," whether the accused device "generate[s] an enable signal ... for enabling execution of the computer software," and whether the dongle generates "pseudorandom numbers" at all. The district court denied Pickholtz's motion for summary judgment of infringement on the ground that Rainbow's dongles are not "located in the computer"; the court did not address the other distinctions raised by Rainbow. Because those potential distinctions could at least raise genuine issues of material fact, summary judgment of infringement would not be appropriate. We therefore affirm the court's denial of Pickholtz's motion for summary judgment.

## C. *Attorney Fees for Pro Se Litigants*

Pickholtz contends that he is entitled under Rule 37 to recover the value of his own time as a *pro se* litigant because of Rainbow's discovery misconduct. Pickholtz, who is both a lawyer and a computer consultant, calculated a "lodestar" figure by multiplying his hourly rate by the number of hours he spent working on the contentious discovery to arrive at $264,039.94 as his opportunity cost. Pickholtz's argument is based on fairness and the furtherance of Rule 37's purpose—deterring discovery abuse. Pickholtz contends that the paltry $1,500 the court awarded him for his expenses only encourages litigants to engage in improper discovery tactics against their *pro se* adversaries. Pickholtz points to *Prewitt v. Alexander*, 173 F.R.D. 438 (N.D.Miss.

1996), *aff'd*, 114 F.3d 1183 (5th Cir.1997) (affirmed without opinion), and several state court decisions that have awarded *pro se* litigants attorney fees under Rule 37, Rule 11, or their state court counterparts. Pickholtz also argues that even if Rule 37 is not a basis for the district court to award him the value of his time, the court's inherent powers enable it to do so.

Besides disputing the accuracy of Pickholtz's lodestar figure, Rainbow responds that the text of the rule is limited to "expenses incurred ... including attorney fees" and that Pickholtz did not incur as an expense the value of his time; that Pickholtz's proposal would unfairly reward *pro se* litigants for the value of their time when represented parties do not receive any compensation for their opportunity costs; and that Pickholtz grounded his request on Rule 37 only, not on the court's inherent powers.

■ We agree with Rainbow that the language of the rule does not allow a *pro se* lawyer to receive fees for his own time. Our analysis is guided primarily by the plain language of the rule, the relevant portion of which reads:

> [T]he court shall ... require the party or deponent whose conduct necessitated the motion of the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses *incurred* in making the motion, including attorney fees....

Fed.R.Civ.P. 37(a)(4)(A) (emphasis added). The rule requires that the expenses be "incurred." We consider that term to be controlling on the issue, as the term means "[t]o have liabilities cast upon one by act or operation of law, as distinguished from contract, where the party acts affirmatively[; t]o become liable or subject to." Black's Law Dictionary (abridged 5th ed.1983). *See also* Webster's Third New International Dictionary (1986) (defining the term as "to become liable or subject to; to bring down upon oneself"). Thus, one cannot "incur" fees payable to oneself, fees that one is not obliged to pay. *See FMB–First Nat'l Bank v. Bailey*, 232 Mich.App. 711, 591 N.W.2d 676, 680–683 (1999) (construing the same term in Michigan's equivalent to Fed.R.Civ.P. 11). Moreover, the word "attorney" connotes an agency relationship between two parties (client and attorney), such that fees a lawyer might charge himself are not "attorney fees." *Massengale v. Ray*, 267 F.3d 1298, 1303 (11th Cir.2001) (concerning Fed.R.Civ.P. 11, the relevant language of which is essentially identical). Nor are such fees a payable "expense," as there is no direct financial cost or charge associated with the expenditure of one's own time. *See id.*

Notwithstanding the plain language of the rule, Pickholtz argues that the objective of Rule 37 supports an award of attorney fees to *pro se* litigants. Pickholtz correctly notes that the objective of Rule 37 distinguishes the award of attorney fees pursuant to Rule 37 from the award of attorney fees under other fee-shifting statutes such as the Civil Rights Act, 42 U.S.C. § 1988, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 5529(a)(4)(E). Thus, the fee shifting provisions in the latter statutes are intended as an incentive for plaintiffs to retain independent counsel and therefore are not available to *pro se* litigants. *Kay v. Ehrler*, 499 U.S. 432, 436, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991) (concerning the Civil Rights Act); *Ray v. Dep't of Justice*, 87 F.3d 1250 (11th Cir.1996) (concerning FOIA). On the contrary, the purpose of Rule 37 is deterrence of misconduct in discovery. *Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 208, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999). Because an objective of Rule 37 is not the encourage-

ment of litigants to retain counsel to independently represent them, *Kay, Ray,* and similar precedent applicable to fee-shifting rules having that objective are not applicable to Rule 37. In any event, the plain language of the rule does not encompass *pro se* litigants.

Our analysis of Rule 37 is analogous to the Eleventh Circuit's analysis of Rule 11 on the same issue in *Massengale,* which is the only other federal appellate case to have addressed this issue. *Massengale* awarded no attorney fees. 267 F.3d at 1303. This case differs from *Massengale* in two respects—(1) it involves Rule 37, not Rule 11; and (2) it involves a lodestar figure representing an opportunity cost, which was not at issue in *Massengale,* 267 F.3d at 1303 n. 2—but neither difference compels a different result. Rule 11 employs language essentially identical to Rule 37, authorizing "payment to the movant of some or all of the reasonable *attorney's fees* and other *expenses incurred* as a direct result of the violation." Fed.R.Civ.P. 11(c)(2) (emphasis added). Moreover, the objective of both rules is similar—deterrence of improper litigation conduct, Rule 11 in pleadings and motions, Rule 37 in discovery. *See Massengale,* 267 F.3d at 1302 (stating that the objective of Rule 11 sanctions is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers").

Secondly, *Massengale* did expressly carve away from its holding the case in which a *pro se* litigant seeks to recover monetary sanctions equaling his income lost as a result of time away from work. 267 F.3d at 1303 n. 2. Instead, the *pro se* lawyer in *Massengale* "sought attorney's fees as the sanction, as though he had been represented by counsel." *Id.* However, we do not discern a meaningful distinction. Whether a *pro se* litigant seeks an award of attorney fees "as though he had

been represented by counsel" or as an opportunity cost makes no difference. In either case, the award of attorney fees to a *pro se* litigant is not within the plain meaning of the rule.

We therefore conclude that Rule 37 does not empower the district court to award attorney fees to a *pro se* litigant. Because the district court did not err as a matter of law in construing Rule 37, the district court acted within its discretion in denying Pickholtz attorney fees pursuant to Rule 37. We do not believe the Ninth Circuit, which has not ruled on the issue, would conclude otherwise concerning a rule of national applicability.

Having concluded that Rule 37 is not a proper basis for awarding attorney fees to Pickholtz, we turn next to whether the inherent powers of the district court may provide such a basis. Although Pickholtz mainly and most conspicuously grounded his request on Rule 37, he also sought relief under the court's inherent powers, stating, "This Motion [for Sanctions under FRCP 37] and the [attached] Chronology describe numerous actions and inactions [by Rainbow] which are sanctionable under FRCP 37, the inherent powers of the Court or otherwise."

 A court's exercise of its inherent powers is reviewed for an abuse of discretion. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Rainbow argues that the court properly did not rely on its inherent powers because the alleged discovery misconduct is governed by a specific rule, namely Rule 37. We disagree, as Rainbow's argument is foreclosed by *Chambers.*

In *Chambers,* Chambers attempted to renege on an agreement he had made to sell a radio station to NASCO, Inc. *Id.* at 35–36, 111 S.Ct. 2123. To that end, he "attempted (1) to deprive [the district]

Court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of [the district] Court, (2) filed false and frivolous pleadings, and (3) attempted by other tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance." *Id.* at 41, 111 S.Ct. 2123. Because Rule 11 reached only Chambers' second category of actions, the district court exercised its inherent powers to award NASCO its entire litigation costs. *Id.* The Supreme Court affirmed, explaining the scope of a court's inherent power and the relationship between that power and express rules governing the same or similar conduct. Regarding the scope of the inherent power, the Court characterized it as "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Id.* at 43, 111 S.Ct. 2123. The power to punish for contempt "reaches both conduct before the court and that beyond the court's confines, for 'the underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.'" *Id.* at 44, 111 S.Ct. 2123 (ellipsis in original) (quoting *Young v. United States,* 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)). Regarding the relationship between the inherent power and express rules, the Court explained:

> [The inherent] power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.

*Id.* at 46, 111 S.Ct. 2123. Congress's provision of express rules that govern the same or similar conduct did not "depart from established principles such as the scope of a court's inherent power." *Id.* at 47, 111 S.Ct. 2123. Instead, express rules supplement, rather than displace, the court's inherent power. *Id.* at 49 n. 13, 111 S.Ct. 2123 (stating that the inherent power "provide[s] courts with an *additional* tool by which to control the judicial process" (emphasis added)). In fact, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id.*

■ *Chambers* thus permits, indeed requires, the court to separately consider Pickholtz's motion for attorney fees under its inherent power, which is an independent basis for assessing sanctions, one not preempted by Rule 37. It is true that there is no federal statutory or appellate precedent for imposing attorney fees sanctions in favor of a *pro se* attorney under a court's inherent power. However, sanctions have clearly been imposed under inherent power, *e.g., Chambers,* 501 U.S. at 41–42, 111 S.Ct. 2123, and they have been imposed in favor of a *pro se* attorney, albeit not under inherent power. We see no reason why in proper circumstances they may not be applied in favor of a *pro se* attorney under inherent power. Failure to do so, as Pickholtz has noted, would place a *pro se* litigant at the mercy of an opponent who might engage in otherwise sanctionable conduct, but not be liable for attorney fees to a *pro se* party. There are other ways of sanctioning a party than assessing attorney fees, such as preclusion of the introduction of evidence or testimony, or even a default judgment. However, attorney fees are such a valuable and frequently used tool in the armamentarium of trial judges that we see no reason for categorically ruling them out of consideration. The district court therefore abused its discretion in determining that it lacked

authority to award attorney fees to a *pro se* attorney.

 Exercise of the court's inherent power must be done with "restraint and discretion." *Id.* at 44, 111 S.Ct. 2123. More particularly, the inherent power can be used to shift attorney fees when there has been: (1) willful disobedience of a court order and (2) conduct that is in bad faith, vexatious, wanton, or for oppressive reasons. *Id.* at 45–46, 111 S.Ct. 2123 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)); *see also Unigard Sec. Ins. Co. v. Lakewood Eng'g,* 982 F.2d 363, 368 n. 2 (9th Cir.1992). Conduct of the second type requires an improper intent or purpose that cannot be inferred from mere tardiness *per se. Fink v. Gomez,* 239 F.3d 989, 992 (9th Cir.2001). In this case, the district court did not explicitly engage in fact finding concerning those alleged acts; nor can we infer from the record that the district court considered whether Rainbow's discovery violations amounted to willful disobedience of a court order or conduct that was in bad faith, vexatious, wanton, or for oppressive reasons. We glean from the record only that the court considered evidence preclusion to be unjustified. *Pickholtz v. Rainbow Techs., Inc.,* No. C 98–2661, slip op. at 2 (N.D.Cal. Apr. 24, 2000) (recommended order imposing sanctions). We therefore remand for the district court to determine whether Pickholtz is entitled to an award of attorney fees pursuant to the court's inherent power, as outlined above.

## CONCLUSION

Because the district court improperly construed the claim terms "computer" and "located in the computer" to exclude peripherals, we reverse the court's grant of summary judgment in favor of Rainbow based upon that claim construction. Fur-thermore, because there exist unresolved factual issues concerning infringement, we affirm the court's denial of Pickholtz's motion for summary judgment of infringement and remand for resolution of those issues. Finally, because the court abused its discretion by failing to consider whether Pickholtz was entitled under its inherent power to compensation for his *pro se* representation in opposition to discovery abuse by Rainbow, we remand for the court to consider that issue. Accordingly, we

*AFFIRM IN PART, REVERSE–IN–PART,* and *REMAND.*